No. 122,039

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOHNNY C. WHITE,
*Appellant*.

SYLLABUS BY THE COURT

1.

Although exclusion of evidence which is integral to a theory of defense may violate a defendant's fundamental right to a fair trial, a defendant's right to present relevant evidence is subject to reasonable restrictions.

2.

Without a stipulation by the parties, a trial court may not admit the results of a polygraph examination, or that a polygraph examination was taken, or that an offer to take that examination was made or refused. The rationale for exclusion is that polygraph examinations are not generally accepted as reliable in the relevant scientific community, and that juries may place undue weight on the results, usurping the role of the jury.

3.

The Kansas Supreme Court has not adopted a limited purpose exception to the general rule excluding polygraph evidence, even when the rationale for inadmissibility is absent. So even if evidence relating to a polygraph examination is an operative fact, unrelated to the correctness of the results of a polygraph examination, the trial court must exclude it, absent a stipulation.

1

**4.**

The State has considerable latitude in charging the time periods during which child victims have been sexually abused. Time is not an indispensable ingredient of the offense of indecent liberties with a child.

**5.**

The Kansas Supreme Court, by "judicial construct," requires courts to weigh probity against prejudice and to find that the probative value of K.S.A. 60-455(d) evidence outweighs its potential for producing undue prejudice.

**6.**

We review the erroneous admission of K.S.A. 60-455(d) evidence for harmless error. Under this standard, the State must prove that there is no reasonable probability that the error contributed to the outcome of the trial.

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed August 6, 2021. Conviction affirmed, sentence vacated in part, and case remanded with directions.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., MALONE and GARDNER, JJ.

GARDNER, J.:  Johnny C. White appeals his conviction of aggravated indecent liberties with a child under the age of 14. He argues that the district court committed reversible error by excluding polygraph examination evidence integral to his defense, allowing the State to amend its charging document, admitting an unduly prejudicial video of his confession to a prior crime, and committing cumulative error. White also argues,

and the State agrees, that the district court erred in sentencing him. We agree that White's sentence must be corrected but find no error warranting the reversal of his conviction.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2017, C.U. told her aunt, Malinda G., that she had been sexually abused in 2009. Although C.U. was sitting in the same room as Malinda, C.U. sent this information to her through a text message. C.U.'s text said that when she was around eight years old, a man named "John" touched her inappropriately when she was at a sleepover with her friend, A.B. C.U. alleged this happened three times. Shannon B., A.B.'s aunt, owned the home where the abuse occurred. Although she did not reference Shannon by name, C.U. told Malinda that she thought "John" was A.B.'s aunt's father and lived in the basement of the house.

C.U. and Malinda found on Facebook a picture of the person C.U. believed was her abuser. Believing she knew her abuser's first and last names, C.U. found photos of John B., which she thought showed similar "facial features" to the man who sexually abused her. C.U. identified John B. as her abuser.

Unbeknownst to C.U., John B. was not Shannon's father but her father-in-law. And John B. did not live or typically stay overnight in Shannon's home. Johnny C. White is Shannon's biological father and he lived in Shannon's home for several years; his bedroom was in the basement. And White had sexually abused Shannon's daughter, his granddaughter, who was a similar age as C.U. and spent a lot of time with C.U. In 2014, White pleaded guilty to aggravated indecent liberties with a child for his sexual abuse of his 15-year-old granddaughter.

3

*Investigation of C.U.'s Allegations*

The morning after C.U. made her disclosure, Malinda called the police. She told the responding officer about C.U.'s statements and showed him a picture of John B. The officer reported the basic information Malinda provided, including C.U. and John B.'s names, before leaving. After the officer left, C.U. reviewed the photo of John B. and realized, possibly because of her Mother's persuasion, that she had misidentified him as the person who abused her. She then identified White as her abuser.

Detective Dan Ribble investigated C.U.'s claims. C.U. told Ribble that White had assaulted her, although she identified her abuser as Shannon's dad. When asked why the police report listed John B., C.U. explained that she had misidentified John B. but had since realized that White was her abuser. C.U. also told Ribble that she knew White had sexually abused his granddaughter.

C.U., who was 15 or 16, also told Ribble that she was around 8 years old and in the second grade when the crime occurred. She alleged that White had inappropriately touched her twice but she remembered only one time. She recalled that White had walked upstairs from his room in the basement, entered the living room where she was sleeping on the couch, sat on the couch, pulled her underwear down, touched her vagina, and forced her to touch his penis. C.U. believed she was lying on her side during the assault.

*Interrogation, Polygraph Examination, and Confession*

Ribble first interviewed White at the Hutchinson Correctional Facility on August 3, 2017. He advised White before he began questioning him that White did not have to speak to him without an attorney present. White told Ribble that he remembered C.U. and generally described what she looked like as a child. White also remembered seeing C.U. at Shannon's home, sometimes sleeping on the couch in the living room. But White

4

denied having touched C.U. and said he never forced C.U. to do anything to him. Before concluding the interview, Ribble asked White if he would later submit to a polygraph examination to corroborate his claims, and White agreed.

Ribble returned to the Hutchinson Correctional Facility with Rick Atteberry, a Kansas Bureau of Investigation investigator, to administer a polygraph examination on August 17, 2017. Atteberry read White his *Miranda* warnings before administering the examination. Ribble was not present when Atteberry questioned White and administered the examination, which took around two hours. Throughout the examination, White maintained that he did not touch or otherwise engage in any sexual activity with C.U. But Atteberry concluded that the polygraph results showed White was being dishonest. And when Ribble returned to the interview room, Atteberry told Ribble that White had failed the polygraph examination, so Ribble began questioning White again.

During his renewed questioning, Ribble referenced White's previous conviction and actions with his granddaughter. Ribble told White that he, not C.U., was lying and that White needed to describe what he did to C.U. because she needed answers so she could get some closure. White acknowledged his previous conviction and conceded that he had sexually abused his granddaughter but continued to deny that he touched C.U. or forced her to touch him. But around 20-30 minutes into Ribble's renewed questioning, White ultimately admitted that C.U. "[was] not lying" and then confessed that he had touched her sexually. White gave details, ultimately admitting that he had rubbed C.U.'s vagina with his hand to make her feel good. But White denied that C.U. had touched him.

*Pretrial Proceedings*

The State charged White with two off-grid counts of aggravated indecent liberties against a child under 14 years old. The first count charged that White touched C.U.'s vagina and the second charged that White forced C.U. to touch his penis.

5

Before trial, White moved to suppress his 2017 confession, asserting it was involuntary and coerced by the polygraph examination. The State argued that White's confession was admissible but moved to exclude any mention of the polygraph examination.

The State also moved in limine to admit a video of White's 2014 confession related to his previous conviction as K.S.A. 60-455(d) propensity evidence. The 2014 video showed an interview by Detective Nathan Gerdsen, in which White confessed in graphic detail to sexual acts with his 15-year-old granddaughter. White objected, arguing the prejudicial effect of the 2014 video was huge, outweighing any probative value, and that the 2014 and 2017 events were factually dissimilar.

The district court held evidentiary hearings on the parties' motions and ultimately ruled for the State. The district court

- found White's 2017 video confession was voluntary and admissible;
- granted the State's motion to exclude all evidence related to White's polygraph examination, including that he agreed to take the examination, that he took the examination, or that he failed the examination; and
- granted the State's request to admit White's 2014 video confession as propensity evidence under K.S.A. 60-455(d).

*White's Stipulation*

Before the district court swore in the jury, White signed a written stipulation that he "was convicted of aggravated indecent liberties on June 10, 2014 in Sedgwick County District Court for events occurring on March 1, 2014 with [C.N.B.]." C.N.B. was White's 15-year-old granddaughter, as the State emphasized in its opening statement, and as later testimony established. White noted that he was not waiving his prior objection to the

6

admission of that conviction or of the 2014 video confession associated with that case. The court accepted the stipulation, confirmed that White had waived no arguments through the stipulation, and renewed its prior rulings on the admission of evidence under K.S.A. 60-455(d).

*Opening Statements*

In his opening statement, White told the jury that C.U.'s allegations were not credible as shown by the circumstances prompting her accusation, the length of the delay in her disclosure, the lack of physical evidence, the inconsistencies in her disclosures to Malinda and Ribble, and the initial identification of John B. as her accuser. White also argued that the evidence would show that the police used coercive tactics to obtain his false confession.

The State's opening referred to White's 2017 and 2014 confessions. The State told the jury that it could consider the evidence involving White's granddaughter but clarified that White was not on trial for those actions.

*Exhibits*

Shortly after making its opening statement, the State admitted and published the video of White's 2014 confession. Throughout the confession, White openly admitted to committing a sex offense—describing an act that most would characterize as rape—against his teenage granddaughter. White cried throughout the interview and told the interviewing detective that he hated himself and had attempted suicide because of his crime.

The State also admitted photos of some of C.U.'s texts to Malinda, and the video of White's 2017 confession. Although the jury heard evidence that Ribble had

7

interviewed White twice, the video showed only a redacted version of the August 17 interview in which White admitted that he touched C.U. sexually but denied that she touched him in any way.

*Testimony*

The State presented testimony from Gerdsen, Malinda, Shannon, C.U., and Ribble. White did not testify on his own behalf, referencing the district court's order precluding testimony related to the polygraph examination. Still, White's defense counsel elicited testimony from the State's witnesses highlighting the inconsistencies in C.U.'s allegations, and the tactics Ribble had used to get White's confession.

C.U. testified that she was around eight years old when White touched her inappropriately and thought it may have occurred in December. But C.U. conceded that she did not know the exact date or even year that it occurred. C.U. testified that she was sleeping on the couch while the other girls were sleeping on the living room floor when White entered the living room. She woke up lying on her back with her pants and underwear pulled down, and White was touching her vagina. C.U. explained that White inserted his fingers inside her and when he stopped, he moved her hand and forced her to masturbate his penis. C.U. testified that after White left, she went back to sleep.

During cross-examination, C.U. admitted that she had alleged three separate incidents of abuse in her text messages to Malinda, yet had later told police that two instances occurred, and at trial recounted only one event. C.U. also testified that she incorrectly told Ribble that she was lying on her side when White touched her, agreeing with defense counsel that the abuse she alleged could not have occurred in that position. C.U. also acknowledged that, unlike her testimony, she had told Ribble that she did not go back to sleep after the incident because she was unable.

8

Ribble described the August 3 interview in which White denied C.U.'s allegations. Ribble also testified that during the August 3 interview, White explained that he had moved out of Shannon's home at some point after losing his job and his unemployment benefits, possibly sometime between 2008 and 2010.

Ribble also described his second interview with White on August 17. And on cross-examination, Ribble agreed that White maintained his innocence throughout the first interview and continued to assert his innocence until late in the second interview. Ribble conceded that he used several interrogation techniques to secure White's confession, including trying to get White to admit to an accidental or inadvertent touching while drunk or while believing C.U. was his granddaughter. Ribble agreed that he had stressed to White that his confession was necessary to give C.U. closure.

Both parties complied with the district court's order precluding testimony related to the polygraph examination. So without mentioning that examination, Ribble testified that the video of the August 17 interview was only part of the entire interview. And Ribble agreed that another detective was present in the interview room, without saying why.

Defense counsel asked Ribble whether he was in the room for White's entire interview or if he could account for all the details of C.U.'s allegation that had been disclosed to White before the confession. Ribble testified that he did not hear the entire interview and thus could not account for every pre-confession detail. And Ribble conceded that he had provided several details to White from C.U.'s allegation before White used those details in his confession.

*State's Motion to Amend Information*

About halfway through the fourth day of trial, the State moved to amend the information by adding about 11 months to the dates on which the alleged crimes occurred, changing the date range from January 1, 2009, through December 31, 2009, to January 25, 2008, through December 31, 2009. The State argued that the amendment was necessary because C.U. had testified that the event had occurred when she was seven or eight years old, but the information included only the timeframe when C.U. was eight. White objected to the amendment, arguing it prejudiced his ability to present an alibi defense because it essentially made it impossible to give an alibi for another year. White also argued that the record showed that he did not live in Shannon's home and instead lived in a rehabilitation center or with his mother for periods of time. White then moved for a continuance to investigate the dates that he did not live in Shannon's house.

The district court denied the continuance, finding it could prejudice the State, and allowed the State to amend the information. The court found that the State did not create the need for the amendment because C.U.'s testimony that the lewd touching could have occurred in 2008 had been elicited by defense counsel on cross-examination. The court also noted that White had not filed a notice of alibi defense before trial and found that even if he had filed notice, K.S.A. 22-3218 allowed the State to amend the information to counter the dates provided in an alibi defense. So the amendment would not prejudice White.

*White's Motion for a Directed Verdict*

After the State rested, White moved for a directed verdict based on insufficient evidence. White alternatively moved to dismiss one of the two charges because C.U. had testified that the abuse occurred only once. The State argued that the evidence was sufficient and that the information's two counts stemmed from White's touching of C.U.

10

and his forcing C.U. to touch him, rather than events on two separate dates. The district court denied White's motion, finding the State had met its burden of proof.

*Deliberation and Verdict*

During its deliberation, the jury submitted two questions to the district court. The jury asked if it could have transcripts of the August interviews with White, and whether "the interview on August 17th or [the second] interview with the two officers [was] sworn testimony by the defendant." But the jury returned a verdict before the court answered either question.

The jury convicted White of count one—alleging a lewd touching of C.U.—but acquitted him of count two—alleging C.U. touched White.

*Post-trial Motions and Sentencing*

White moved for an acquittal and for a new trial. The district court denied both motions.

White also moved for a departure sentence, but the district court denied that as well. The district court sentenced White to lifetime imprisonment without the possibility of parole for 25 years and ordered lifetime parole with electronic monitoring. The court's journal entry of sentencing also required White to serve lifetime postrelease supervision.

White timely appeals.

## I.    DID THE DISTRICT COURT ERRONEOUSLY PRECLUDE EVIDENCE RELATED TO THE POLYGRAPH EXAMINATION?

White first contends that the district court's order prohibiting the admission of his polygraph examination results and any testimony related to his polygraph examination precluded him from presenting a complete defense. That ruling, he contends, kept him from telling the jury all the circumstances surrounding his confession.

*Factual Background*

White never proffered to the district court the specific testimony that he wanted the jury to hear relating to the polygraph, other than that he had taken a polygraph examination. But he now argues that he wanted to tell the jury the circumstances of his 2017 interview. For example, his interview was about 3.5 hours long—2 hours consisted of the polygraph examination. And White asserts that during the polygraph examination questioners repeatedly accused him of lying. Yet the jury saw only about 45 minutes of the interview through the 2017 video, and it excluded all accusations of White's lying. Thus, the jury could reasonably, yet erroneously, infer that no one had accused White of lying during his interview and that it lasted less than an hour.

Although White does not tell us the relevance of the circumstances surrounding his 2017 video confession, he suggests they were coercive. But the district court specifically examined that issue in ruling on White's earlier motion to suppress. White's motion to suppress asserted that his 2017 confession was involuntary and had been coerced by the polygraph examination. At the hearing on that motion, White claimed that although Atteberry had explained what the polygraph examination would entail, White did not understand how it worked and thought it would exclude him as a suspect. White also testified that he did not lie during the examination and was surprised when Atteberry told him he had failed. Defense counsel argued that if the trial court admitted White's

12

2017 confession, it would also have to tell the jury that White's confession was because of his polygraph examination. Defense counsel agreed, however, that the jury should not be told the results. The district court reviewed the length of that interview, the accusations of lying, and all other circumstances, and found the circumstances not coercive. The court found White's confession voluntary and denied the motion to suppress his 2017 video interview. White does not challenge that ruling on appeal, so we do not revisit it.

*Standard of Review and Basic Legal Principles*

Admission of evidence involves several legal considerations. See *State v. Shadden*, 290 Kan. 803, 817-18, 235 P.3d 436 (2010). The district court must first determine whether the evidence is relevant. All relevant evidence is admissible unless it is prohibited by statute, constitutional provision, or court decision. See K.S.A. 60-407(f); *Nauheim v. City of Topeka*, 309 Kan. 145, 153, 432 P.3d 647 (2019). Even if relevant, a district court has discretion to exclude evidence when it finds its probative value is outweighed by its potential for producing undue prejudice. See K.S.A. 60-445. An appellate court reviews these determinations for an abuse of discretion. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018).

Whether a particular legal principle or statutory rule governs the admission of specific evidence is a question of law subject to de novo review. A principle or rule, however, is applied as a matter of law or as an exercise of the district court's discretion, depending on the applicable rule. See *State v. Miller*, 308 Kan. 1119, 1166, 427 P.3d 907 (2018). Whether an evidentiary ruling has violated the defendant's constitutional right to present a defense is subject to unlimited appellate review. See *State v. Seacat*, 303 Kan. 622, 638-39, 366 P.3d 208 (2016).

*Kansas Precedent Establishes That Polygraph Evidence is Inadmissible.*

White argues that the trial court's exclusion of all evidence relating to the polygraph examination deprived him of his right to present a complete defense. Fair trial concepts, much like those in the United States Constitution, are incorporated in our state constitutional provision pertaining to defense of the accused. *State v. Hall*, 220 Kan. 712, 714, 556 P.2d 413 (1976); see Kan. Const. Bill of Rights, § 10. "The [United States] Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 684-85, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The United States Supreme Court has held that "whether rooted directly in the Due Process Clause of the Fourteenth Amendment, . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment," the Constitution guarantees criminal defendants "'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986).

Still, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998). And as a matter of constitutional law, the right to make a defense does not require admission of a lie detector examination. See 523 U.S. at 307-08 (determining that per se ban on polygraph evidence does not violate Fifth or Sixth Amendment right to present a defense).

Applying similar principles, our Supreme Court has consistently held that "[a] defendant must be permitted to present a complete defense in a meaningful manner," and exclusion of evidence which is integral to a theory of defense violates a defendant's fundamental right to a fair trial. *State v. Green*, 254 Kan. 669, 675, 867 P.2d 366 (1994); *State v. Gonzales*, 245 Kan. 691, 699, 783 P.2d 1239 (1989). "[A] defendant's right to call

14

and examine witnesses is not absolute and on occasion will be overridden by 'other legitimate interests in the criminal trial process.'" *Green*, 254 Kan. at 675. And the right to present a defense is "subject to statutory rules and judicial interpretation of the rules of evidence and procedure." *State v. Banks*, 306 Kan. 854, 865, 397 P.3d 1195 (2017).

Still, our Supreme Court has long expressed its hostility to the admission of unstipulated polygraph evidence. It has consistently reaffirmed that absent a stipulation, the results of a polygraph examination are inadmissible. See *State v. Shively*, 268 Kan. 573, 579, 999 P.2d 952 (2000); *State v. Wise*, 237 Kan. 117, 124, 697 P.2d 1295 (1985). The rationale for inadmissibility is twofold:

> "[F]irst, polygraph examinations are not generally accepted as reliable in the relevant scientific community; second, juries may place undue weight on it because it stands as a kind of witness in absentia on the question of whether a witness is telling the truth, usurping the role of the jury." *In re Care & Treatment of Foster*, 280 Kan. 845, 862, 127 P.3d 277 (2006).

And it is not just the results of polygraph examinations that are inadmissible. Our Supreme Court has also held inadmissible the fact that an examination was taken, or, absent a stipulation, an offer was made or an offer was refused. *State v. Webber*, 260 Kan. 263, 276, 918 P.2d 609 (1996). Thus absent a stipulation, neither the refusal to submit to such an examination nor the offer to do so is admissible. *State v. McCarty*, 224 Kan. 179, 182, 578 P.2d 274 (1978); *State v. Roach*, 223 Kan. 732, Syl. ¶ 1, 576 P.2d 1082 (1978). It is improper to permit the defendant to refer to the taking of a polygraph test. See *Wise*, 237 Kan. at 123-24. And it is improper to admit opinions that are based on the polygraph examination and results, either directly or indirectly. *Foster*, 280 Kan. at 864. So even if some polygraph evidence were an operative fact, unrelated to the substantive correctness of the results of White's polygraph examination, the trial court must exclude it absent a stipulation. Because the parties did not enter a stipulation here, evidence about the polygraph examination was inadmissible.

White suggests that he was willing to stipulate, if necessary. But White cites no record showing that he offered to stipulate to the admission of the polygraph evidence. Besides, an offer to stipulate is insufficient—a stipulation is necessary.

White argues that his right to present a defense trumps any evidentiary concerns. Yet we are not persuaded. Our Supreme Court has held that exclusion of polygraph evidence does not violate a defendant's right to present a defense. See *Shively*, 268 Kan. at 588. The right to present a defense is not unlimited and must yield to reasonable restrictions, including those imposed by evidentiary rules and caselaw. See *Banks*, 306 Kan. at 865. And our longstanding rule requiring stipulations before admitting polygraph evidence does not implicate constitutional guarantees. See *State v. Engelhardt*, 280 Kan. 113, 137, 119 P.3d 1148 (2005) (adopting *Scheffer* and rejecting claim that exclusion of polygraph evidence violated Sixth Amendment right to present a defense); *Shively*, 268 Kan. at 588 (same).

The bottom line is that this court is duty bound to follow Kansas Supreme Court precedent. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We thus deny White's claim that he was denied the right to present a defense based on the erroneous exclusion of polygraph evidence.

*We Do Not Apply the Limited Purpose Exception.*

White acknowledges that Kansas caselaw disfavors his position. But he tries to distinguish his case by arguing that the twofold rationale for inadmissibility does not apply here, so the general rule should not apply either. See *Foster*, 280 Kan. at 862 (finding polygraph test results reliable enough to be admitted in probation revocation proceedings). White contends that the lack of scientific reliability of polygraph examinations does not matter here because he did not seek to admit polygraph evidence to show the truth of the results but merely to show the circumstances of his examination.

And, he argues, merely admitting the circumstances surrounding the examination, rather than its results, would not cause the jury to place undue weight on the results, usurping the jury's role.

Because neither traditional rationale for excluding polygraph evidence applies, White contends that the district court should have applied a limited purpose exception to the general inadmissibility rule. White relies on a federal rule that polygraph evidence may be admitted if it is for a limited purpose unrelated to the substantive correctness of the results of the polygraph examination. See *United States v. Miller*, 874 F.2d 1255, 1261 (9th Cir. 1989). Thus, when polygraph evidence is not offered as scientific evidence, no per se rule against admissibility applies. See *United States v. Blake*, 571 F.3d 331, 346 (4th Cir. 2009) ("Polygraph results are generally inadmissible. However, 'testimony concerning a polygraph examination is admissible where it is not offered to prove the truth of the polygraph result, but instead is offered for a limited purpose such as rebutting a defendant's assertion that his confession was coerced.' [Citations omitted.]"). Under the federal limited purpose exception, when polygraph evidence is not offered to prove the truth of the polygraph results, and a defendant opens the door, such as by attacking the nature of a criminal investigation or asserting that testimony was coerced, the State may admit polygraph evidence (subject to probative value and prejudicial effect considerations) for the limited purpose of rebutting a defendant's claim of a coerced confession. *United States v. Tenorio*, 809 F.3d 1126, 1130-31 (10th Cir. 2015) (stating that federal circuits have uniformly so held, before and after *Daubert*).

But White shows no cases applying the limited purpose exception under facts like his, when a defendant seeks to admit the polygraph evidence *in support of* a claim of a coerced confession, rather than when the State seeks to admit it *to rebut* a claim of coercion. See *United States v. Allard*, 464 F.3d 529, 533 (5th Cir. 2006) (rejecting Rule 702's application where polygraph evidence provides a rebuttal account of the facts and circumstances surrounding a confession); *United States v. Johnson*, 816 F.2d 918, 923

(3d Cir. 1987) ( "[C]ase law shows that evidence concerning a polygraph examination may be introduced to rebut an assertion of coercion of a confession."); *United States v. Kampiles*, 609 F.2d 1233 (7th Cir. 1979); *Tyler v. United States*, 193 F.2d 24, 31 (D.C. Cir. 1951). And White's argument that his 2017 confession was coerced was nipped in the bud by the district court's denial of his suppression motion based on the court's finding that White confessed voluntarily.

Moreover, even if White sought to admit polygraph evidence merely to provide context for his confession, the premise of his argument is flawed. White asserts that the district court made a legal error by excluding all evidence related to the polygraph examination because it relied on cases that require only the exclusion of results. See *State v. Mason*, 238 Kan. 129, 131, 708 P.2d 963 (1985); *State v. Blosser*, 221 Kan. 59, 62, 558 P.2d 105 (1976). As a result, White invites us to interpret Kansas caselaw as permitting a limited purpose exception.

But as we noted above, Kansas caselaw is broader than White wishes. See, e.g., *Foster*, 280 Kan. at 864; *Webber*, 260 Kan. at 276. For example, in *Wise*, our Supreme Court determined it was "improper" not only to allow a defendant to refer to polygraph results but also to allow a defendant to refer to the giving of a polygraph examination. 237 Kan. at 123-24. See *Mason*, 238 Kan. at 131.

True, our Kansas cases are far from recent, but the Kansas Supreme Court reaffirmed in 2000 that results of a polygraph examination of a defendant are not admissible, despite claimed advances in the computerization of polygraph technology and scoring. *Shively*, 268 Kan. at 585-87. The court underscored the continuing validity of the traditional rationales for not admitting polygraph evidence:

"[T]he common control question polygraph examination used in the present case is not generally accepted as reliable in the relevant scientific community, despite the trial court's ruling to the contrary.

"Moreover, the other concerns about polygraph evidence (that juries may place undue weight on it and that it stands as a kind of witness in absentia on the question of whether a witness is telling the truth, usurping the role of the jury) remain valid." 268 Kan. at 586.

The court also explained in *Shively* that it has never adopted exceptions to the stipulation requirement, and it found even the "limited" polygraph evidence that the district court had allowed for purposes of corroboration was inadmissible. 268 Kan. at 587. Its analysis shows the rationale for not admitting even limited polygraph evidence, absent a stipulation:

"Shively also asserts that the usual concerns over polygraph evidence were alleviated in this case by the trial court's 'precautions' (derived from *United States v. Piccinonna,* 885 F.2d 1529 [11th Cir. 1989], and *Crumby,* 895 F. Supp. 1354) of only allowing the polygraph testimony for corroboration and of only allowing Davis to testify that Shively's exam was generally indicative of a truthful test outcome regarding the relevant questions, without discussion of the specific questions, responses, or the probable truthfulness or deception of the responses to particular questions. We disagree. In fact, this method of limitation actually complicates the problem by requiring the jury to speculate as to what Shively said during his pre-test interview and as to what was asked in the test questions that Shively supposedly answered truthfully. Such evidence gave the jurors the general impression that Shively's out-of-court version of events was consistent with his in-court version, but the jury was never actually told this and was therefore unable to directly evaluate exactly what Shively said when he was being 'truthful.' This served only to inject speculation into the trial, with little offsetting value as to the quality of the information actually being conveyed. This court has previously held that even the fact that an examination was taken or that there was an offer to take one is not admissible, *State v. Webber*, 260 Kan. 263, 276, 918 P.2d 609 (1996), *cert. denied* 519 U.S. 1090, 117 S. Ct. 764, 136 L. Ed. 2d 711 (1997). The 'limited' polygraph evidence that was allowed in this case was equally inadmissible." 268 Kan. at 587.

Similarly, arguments by counsel in White's trial show how admitting any evidence relating to White's polygraph evidence could be problematic, creating jury speculation. In a bench conference during Ribble's cross-examination, defense counsel asked the court whether he could ask Ribble about the length of the interview that produced White's 2017 confession if he did not mention the polygraph. The State objected, reasoning that it would then need to tell the jury about the polygraph examination to rebut White's selective information suggesting that an extended interrogation produced a false confession or that the officers had lied about the results of the polygraph when interviewing White. The court denied defense counsel's request and prohibited the testimony.

We recognize that the circumstances surrounding White's confession were less related to the results of the polygraph examination than the evidence the defendant sought to admit in *Shively.* Still, here, as in *Shively*, granting defense counsel's request would have injected speculation into the trial, with little offsetting value as to the quality of the information, particularly since the district court had examined those circumstances and found White's confession was not coerced. And to counter that speculation, the State may have needed to admit additional evidence. Those complications can often be foreseen by the parties and addressed in a detailed stipulation, but absent a stipulation the district court would invite speculation by admitting the evidence White desires.

The bottom line is that our Supreme Court, in *Shively*, essentially rejected the limited purpose exception that White touts. Despite the logical appeal of that exception, we are not free to carve out any exception to the broad per se inadmissibility rule that our Supreme Court continues to follow. We thus reject White's assertion that the district court should have adopted a limited purpose exception permitting him to show the circumstances surrounding his voluntary confession. We find no error in the district court's exclusion of evidence relating to White's polygraph examination.

## II.    DID THE DISTRICT COURT ABUSE ITS DISCRETION BY ALLOWING THE STATE TO EXPAND THE DATES IN THE CHARGING DOCUMENT?

White next contends that, over his objection, the district court erroneously allowed the State to amend the information during trial, enlarging the timeframe from 12 months to 23 months. Arguing that the amendment prejudiced his alibi defense and violated his substantial rights, White asks us to reverse his conviction.

*Standard of Review and Basic Legal Principles*

Kansas appellate courts apply an abuse of discretion standard in reviewing a district court's decision whether to allow an amendment to an information. *State v. Calderon-Aparicio*, 44 Kan. App. 2d 830, 848, 242 P.3d 1197 (2010). A district court abuses its discretion if its judicial action is arbitrary, fanciful, or unreasonable, or if its judicial action stems from an error of fact or law. *State v. Jenkins*, 308 Kan. 545, 557, 422 P.3d 72 (2018). White bears the burden to establish an abuse occurred. See *State v. Holman*, 295 Kan. 116, 145, 284 P.3d 251 (2012), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

*Analysis*

The trial court may allow the State to amend an information at any time before a verdict if it charges no additional or different crime and if substantial rights of the defendant are not prejudiced. K.S.A. 22-3201(e). The State's amended information here did not charge an additional or different crime—it changed only the date of the offenses. So our analysis turns on whether that expansion of dates prejudiced White's substantial rights.

In determining whether an amendment prejudices a defendant, we consider whether:

- the date of the offense was a critical or material issue;
- the statute of limitations was involved;
- an alibi was a defense;
- time was an element of the offense; and
- the defendant was surprised by the amendment.

See *Holman*, 295 Kan. at 146-47; *State v. Dickerson*, No. 116,628, 2018 WL 5851444, at *3-4 (Kan. App. 2018) (unpublished opinion).

The time and statute of limitations factors are not relevant here. See K.S.A. 2020 Supp. 21-5506(b)(3). But White maintains that the amendment was a surprise, that the extension of time damaged his alibi defense, and that the length of time added was unreasonable.

*Relevant Facts*

Unsurprisingly, C.U. did not recall the exact date of the sexual abuse, as it occurred over eight years before she reported the incident. Before trial, she told Ribble she thought she was around eight years old and in the second grade when the incident occurred. Presumably based on C.U.'s January 2001 birthday, Ribble determined that C.U. was sexually abused in 2009. In line with C.U.'s pretrial allegations, the State's original information alleged that White committed two counts of aggravated indecent liberties against C.U. between January 1, 2009, and December 31, 2009.

At trial, C.U. testified that she was eight years old when White abused her. During the State's direct examination, she added that she believed it occurred in December. But

22

on cross-examination, defense counsel asked C.U. if she was seven years old in 2008 and turned eight in 2009. Counsel also asked what grade C.U. would have been in 2008 and 2009, and C.U. agreed that her second-grade year was split between 2008 and 2009. This line of questioning ended after defense counsel asked C.U. whether she could say with certainty that she was "talking about 2008 or 2009," and she replied, "That's the age I remember."

Besides Ribble's testimony that C.U. said she was in the second grade when White abused her, Ribble testified that he believed C.U.'s second-grade year would have been 2009. But he also agreed with defense counsel that in December 2008, C.U. would have been in the middle of her second-grade year.

The next day of trial, nearing the close of the State's case, the State moved to amend the information to change the dates of the charged offenses from January 1, 2009, through December 31, 2009, to January 25, 2008, through December 31, 2009. The State argued that this change was necessary to conform to the evidence elicited by defense counsel which showed C.U. was either seven or eight when the incident occurred and that her second-grade year was in both 2008 and 2009. The State argued that the amendment was appropriate because:

- the date was not critical;
- the amended dates would not raise a statute of limitations issue;
- White's theories of defense related to the identity of C.U.'s abuser and the credibility of White's confession and thus would not be impacted by the change; and
- White had not raised an alibi defense.

Defense counsel objected, maintaining it was unduly prejudicial and would preclude him from effectively presenting his alibi or any other defense. But the district

court allowed the amendment, citing *State v. Campbell*, No. 113,005, 2016 WL 1274482 (Kan. App. 2016) (unpublished opinion), a child sex offense case applying similar factors to those above. The district court noted that although it was granting the amendment and White had not filed a notice of alibi, White could still present alibi evidence by his own testimony.

*Significance of the Change and Surprise*

Our appellate courts have typically afforded the State considerable latitude in charging the time periods during which child victims have been sexually abused. See *State v. Rojas-Marceleno*, 295 Kan. 525, 536-37, 285 P.3d 361 (2012). In *State v. Nunn*, 244 Kan. 207, 224, 227-28, 768 P.2d 268 (1989), our Supreme Court rejected a claim much like the one White raises here. Nunn challenged the State's amendments to a complaint charging him with indecent liberties with a child and aggravated criminal sodomy. There, as here, the appellant argued that the amendment, which increased the time in which the crimes were alleged to have occurred by almost 11 months, prevented him from forming an adequate defense. The *Nunn* court found that "[t]ime is not an indispensable ingredient of the offenses of indecent liberties with a child or aggravated criminal sodomy." 244 Kan. 207, Syl. ¶ 19. The court explained that "'it is not unusual for uncertainty as to dates to appear particularly where the memories of children are involved.'" 244 Kan. at 227 (quoting *State v. Sisson*, 217 Kan. 475, 478, 536 P.2d 1369 [1975]). As Kansas law recognizes, children experience the passage of time differently than adults. See K.S.A. 2020 Supp. 38-2201(b)(4) (Revised Kansas Code for Care of Children stating the policy of the state is to "acknowledge that the time perception of a child differs from that of an adult").

Uncertainty about dates was apparent here. Not only were C.U.'s memories made when she was around eight years old, they laid dormant in her mind for over eight years before she told her aunt about the incident. And when objecting to the amendment,

24

defense counsel argued that the State's original information was already too broad. So defense counsel knew C.U. was unclear about the exact date of the offense and thus should not have been surprised that the relevant time might change. See *State v. White*, 1 Kan. App. 2d 452, 457, 571 P.2d 6 (1977) (when a defendant had actual or constructive knowledge of the date of a crime, he or she is not prejudiced by imprecise dates).

Because time is not an essential element of the offense of indecent liberties with a child, and White knew at pretrial that the State could establish only an approximate time for the offenses, we cannot say that the district court abused its discretion in not finding prejudicial surprise.

*Alibi Defense*

We next address White's claim that the amendment prejudiced his alibi defense. White concedes that he did not file a notice of intent to rely on an alibi defense, but he correctly asserts that he did not need to do so because he did not intend to call any witnesses to present his alibi defense. See K.S.A. 22-3218(1) ("no such notice shall be required to allow testimony as to alibi, by the defendant himself, in his own defense").

White also correctly asserts that he presented some alibi evidence at trial, although he did not testify. White did so through cross-examination of the State's witnesses. Ribble testified that during his August 3 interview, White told him that during some of the time C.U. alleged she was sexually abused, he did not live in the house where she alleged the abuse occurred. And the homeowner testified that White may have moved out of the home as early as 2008, though it was more likely "towards 2009." The amended time frame thus did not prevent White from introducing evidence concerning his whereabouts during this time. We note that White asked for a continuance to gather additional information to support his alibi defense, but the district court denied that request and White does not challenge that denial on appeal, so he has waived it. See *State v. Salary*,

25

309 Kan. 479, 481, 437 P.3d 953 (2019) (issues not briefed deemed waived or abandoned). Still, White does not give any specific reason he did not procure more evidence before trial to support his alibi defense. And the record fails to show that the amendment had any impact on his minimally developed alibi defense.

White has outlined no actual prejudice. Nor do we perceive any. Given that White admitted his guilt at trial to Count I during his 2017 video confession, it is unclear how the amendments to that Count, or to Count II, which allegedly occurred on the same date as Count I, could have caused any prejudice.

We find that the district court applied the correct factors and did not abuse its discretion in permitting the amendment.

III.    DID THE DISTRICT COURT ERR BY ADMITTING WHITE'S 2014 CONFESSION AS PROPENSITY EVIDENCE?

White next contends that the district court erred by admitting the video of his 2014 confession in which he admitted sexually abusing his 15-year-old granddaughter. White argues that the district court committed factual and legal error in weighing the probative value of that evidence against its prejudicial effect. White asks us to reverse his conviction and remand for a new trial.

*Relevant Facts*

We recap the relevant facts. White first objected to the State's motion to admit his 2014 confession at a pretrial motion hearing. White argued that admitting the confession would be extremely prejudicial and would outweigh any probative value. He also argued that the circumstances of C.U.'s alleged offenses in 2008 and the circumstances involving

26

his granddaughter in 2014 were too dissimilar and too far apart in time to show propensity.

On the morning of the third day of his trial, White offered his written stipulation to his 2014 conviction, while clarifying that he did not waive any prior challenges to the evidence. White stipulated that he "was convicted of aggravated indecent liberties on June 10, 2014 in Sedgwick County District Court for events occurring on March 1, 2014 with [C.N.B.]." He then renewed his objection to admission of his 2014 video confession, alleging it would be "redundant and unnecessary." White renewed his objection again when the State offered the video into evidence, but the court denied that objection. White contends that the district court erred by admitting the prejudicial 2014 video confession after the court admitted his less prejudicial stipulation to that same crime.

The State asserts that choices regarding evidence are within its province as the prosecutor, so it could elect the video as the evidence it wanted the jury to consider in determining White's guilt. See *State v. Thomas*, 302 Kan. 440, 450-51, 353 P.3d 1134 (2015) (finding choices regarding evidence "within the prosecutor's province"). The State contends that it chose to show the video because the video gave the jury the information necessary to show propensity while sparing White from the potentially more prejudicial effect of calling his granddaughter to testify.

*Standard of Review and Legal Principles*

Because of the nature of the offense, many sex crime cases reduce to a "he said, she said" battle in which credibility and corroboration are crucial. "[M]any sex crimes lack concrete evidence that a crime was committed, and the propensity evidence therefore is more demonstrative and necessary than propensity evidence in other kinds of prosecutions." *State v. Boysaw*, 309 Kan. 526, 534, 439 P.3d 909 (2019) (citing *State v. Borchert*, 68 Kan. 360, 362, 74 P. 1108 [1904]).

"It is well settled that, in prosecutions for a single act forming a part of a course of illicit commerce between the sexes, it is permissible to show prior acts of the same character. Such cases are sometimes (as in *State v. Markins et al.*, 95 Ind. 464, 48 Am. Rep. 733) said to form an exception to the general rule that one crime cannot be proved in order to establish another independent crime. In fact, however, they fall within the rule already stated. Such evidence is admitted not because it proves other offenses, but in spite of that fact. Its justification is that it is corroborative of the direct evidence of the offense charged. [Citations omitted.]" *State v. Borchert*, 68 Kan. 360, 361-62, 74 P. 1108 (1904).

The Kansas Legislature in 2009 recognized the unique nature of other crimes evidence in sex offense cases by enacting K.S.A. 2009 Supp. 60-455 section (d). That statute is expansive, as it "allows the admission of any propensity evidence that is relevant and probative" in sex offense cases. *Boysaw*, 309 Kan. at 539. It states:

"Except as provided in K.S.A. 60-445, and amendments thereto, in a criminal action in which the defendant is accused of a sex offense . . . evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative." K.S.A. 2020 Supp. 60-455(d).

This contrasts with the general rule in cases not charging a sex offense—in those cases, "evidence that a person committed a crime or civil wrong on a specified occasion, is *inadmissible* to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." (Emphasis added.) K.S.A. 2020 Supp. 60-455(a). The Legislature has thus recognized that propensity evidence in sex offense cases is different than propensity evidence in other cases.

Because White was charged with a sexual offense and his 2014 confession was evidence of another sexual offense, his 2014 confession was admissible under K.S.A. 2020 Supp. 60-455(d) to show White had the propensity to sexually abuse a child. Cf.

28

*State v. Spear*, 297 Kan. 780, 789, 304 P.3d 1246 (2013). The evidence was also admissible to prove intent. See K.S.A. 2020 Supp. 60-455(b).

White recognizes this general law but asserts that given the contents of the video, the court erred by insufficiently weighing its prejudicial nature, and by not finding that less prejudicial evidence was sufficient to establish his 2014 crime.

As explained in *Boysaw*, "[t]he plain statutory language of K.S.A. 2018 Supp. 60-455(d) appears to allow such evidence without requiring a weighing of probity versus prejudice." 309 Kan. at 540. It is likewise true, as the State suggests, that the only Kansas statute limiting this admissibility decision is K.S.A. 60-445, which allows discretionary exclusion if the trial judge finds that the probative value of the evidence is substantially outweighed by the risk that the evidence will "unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered." But this statutory limitation addresses only unfair surprise.

Still our Supreme Court has, by "judicial construct," required courts to weigh probity against prejudice and to find the probative value of K.S.A. 60-455(d) evidence outweighs its potential for producing undue prejudice. See *Boysaw*, 309 Kan. 540-41; *State v. Gunby*, 282 Kan. 39, 48, 144 P.3d 647 (2006), *holding modified on other grounds by State v. Campbell*, 308 Kan. 763, 423 P.3d 539 (2018). Although the plain statutory language of K.S.A. 2020 Supp. 60-455(d) appears to allow such evidence without requiring a weighing of probity versus prejudice, our Supreme Court continues to require that weighing, reasoning that the exclusion of unduly prejudicial prior acts is necessary to protect due process rights. *Boysaw*, 309 Kan. at 540. We review whether the probative value of otherwise relevant evidence outweighs its potential for undue prejudice for abuse of discretion. *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014).

*Application*

*Boysaw* teaches that in evaluating the probative value of evidence of other crimes or civil wrongs, the district court should consider, among other factors: (1) how clearly the prior act was proved; (2) how probative the evidence is of the material fact sought to be proved; (3) how seriously disputed the material fact is; and (4) whether the government can obtain any less prejudicial evidence. 309 Kan. at 541. The district court properly considered *Boysaw*'s factors and analyzed the probative effect in detail. The court considered the video, the accompanying *Miranda* statement, and Gerdsen's testimony from the pretrial proceeding in finding White's 2014 video confession to sexually abusing his granddaughter highly probative.

The court's assessment of the prejudicial effect was more cursory, perhaps skirting *Boysaw*'s guidance that

> "[i]n evaluating the possible prejudicial effect of evidence of other crimes or civil wrongs, the district court should consider, among other factors: the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury from the central issues of the trial; and how time consuming it will be to prove the prior conduct." 309 Kan. at 541.

White focuses his argument on two factors: "whether the government can obtain any less prejudicial evidence," and "the likelihood that such evidence will contribute to an improperly based jury verdict." 309 Kan. at 541 (citing *United States v. Benally*, 500 F.3d 1085, 1090-91 [10th Cir. 2007]).

But contrary to White's argument on appeal, the record shows that the district court considered whether less prejudicial evidence was available. Yet it found none:

"There appears to be no less prejudicial evidence the State can utilize to prosecute its case and present the evidence. I will note that the State in proffering and in telling me that the State is not calling the victim as a witness in the 14 CR 538 case. The only live witness, I understand, is Detective Gerdsen, and it is only to provide foundation for the only two exhibits offered by the State, which I've already identified. To that end, I have reviewed all of that proffered evidence other than the future testimony, but I have heard Detective Gerdsen testify."

That was before White stipulated.

White stipulated mid-trial that he "was convicted of aggravated indecent liberties on June 10, 2014 in Sedgwick County District Court for events occurring on March 1, 2014 with [C.N.B.]." And he renewed his objection to admitting the video of his 2014 confession to that same crime. Contrary to the State's pretrial statements, the State then claimed that it would have subpoenaed White's granddaughter to testify if the court did not admit that video. The court again found the video admissible, stating that the 2014 video, with Detective Gerdsen's foundational testimony and the stipulation, was "the least prejudicial way to attain what the State desires."

The court appears to conclude that the video was less prejudicial to White than calling White's granddaughter to testify. But the State never subpoenaed White's granddaughter to testify, and the district court failed to state why Gerdsen's testimony, coupled with White's stipulation, was not a less prejudicial way to admit the relevant facts about White's prior sexual abuse of his granddaughter.

The court specifically considered whether the evidence was likely to contribute to an improperly based jury verdict. It found that the evidence would not do so, stating only that it presumes a properly instructed jury knows the law, and citing *State v. Thurber*, 308 Kan. 140, 420 P.3d 389 (2018). But despite the court's statement that it would counter undue prejudice with a limiting instruction, it did not give the jury any limiting

31

instruction related to the video. Rather, the jury instructions are scant and do not give the jury any guidance about White's 2014 video confession, his stipulation, or his 2017 video confession.

Additionally, given the contents of the 2014 video, we find it difficult to conclude that the district court gave due weight to the powerfully prejudicial effect that admission of the video could have on White's defense. That video showed:

- White's confession to having raped his granddaughter and graphic details of his repeated sexual acts with her;
- White was inconsolable, crying throughout the video;
- White repeatedly stated that he hated himself and had attempted suicide because of his actions;
- The questioning and responses were repetitive—not merely asked and answered but repeatedly revisited; and
- White's graphic descriptions of his acts and his characterization of the victim are likely to provoke anger, resentment, or disgust in a reasonable juror.

Having viewed the video, we agree that it could easily inflame the passions or prejudices of the jury. Yet appellate courts do not reweigh evidence. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). In any event, we find it unnecessary to conclude whether the court erred in admitting the 2014 video. Rather, we assume, without finding, that the court so erred.

*Harmless Error*

The erroneous admission of K.S.A. 60-455 evidence does not automatically compel a new trial. Rather, we review the erroneous admission of K.S.A. 60-455 evidence for harmless error. Under this standard, the State must prove that there is no

reasonable probability that the error contributed to the outcome of the trial. *State v. Longstaff*, 296 Kan. 884, 895, 299 P.3d 268 (2013); see K.S.A. 2020 Supp. 60-261.

To meet its burden, the State contends in a conclusory fashion that even without White's 2014 confession, the jury would still have convicted White as they did based on C.U.'s detailed testimony, White's admission to touching C.U., and White's stipulation showing he was convicted in 2014 of a similar offense.

Our Supreme Court has recognized three types of prejudice that may result from the admission of prior crimes evidence:

> """First a jury might well exaggerate the value of other crimes as evidence proving that, because the defendant has committed a similar crime before, it might properly be inferred that he committed this one. Secondly, the jury might conclude that the defendant deserves punishment because he is a general wrongdoer even if the prosecution has not established guilt beyond a reasonable doubt in the prosecution at hand. Thirdly, the jury might conclude that because the defendant is a criminal, the evidence put in on his behalf should not be believed."' [Citation omitted.]" *Gunby*, 282 Kan. at 48-49.

On close examination, we find none of these potentials for prejudice undermines our confidence in the verdict.

The first potential prejudice—that a jury might infer that the defendant committed this crime because the defendant committed a similar crime before—is not prohibited in a K.S.A. 60-455(d) case, such as this one. In most cases, evidence that a person committed a crime or civil wrong on a specified occasion is *inadmissible* to prove such person's disposition to commit a crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion. K.S.A. 2020 Supp. 60-455(a). Thus, in *Gunby*, a propensity inference was improper, and the district court had to give a limiting instruction telling the jury the specific purpose for admitting

33

evidence of other crimes or civil wrongs. But the opposite is true in 60-455(d) cases, as propensity evidence in sex offense cases is admissible and may be considered for its bearing on any matter to which it is relevant and probative. K.S.A. 2020 Supp. 60-455(d). The district court specified how White's 2014 confession was relevant and probative to show propensity. So *Gunby*'s first potential prejudice is not an issue.

Nor is *Gunby*'s second potential prejudice shown here. The jury apparently did not conclude that White deserved punishment because he is a general wrongdoer, since the jury convicted White of only one crime, although the State charged him with two off-grid counts of aggravated indecent liberties against a child under 14 years old. The jury convicted White of Count I—alleging White's lewd touching of C.U.—but acquitted him of Count II—alleging C.U. touched White. Had White's 2014 video confession to abusing his granddaughter inflamed and prejudiced the jury against White, the jury likely would have convicted White of both sex crimes, as charged.

Nor is the third potential prejudice shown here—the jury did not conclude that because White is a criminal, the evidence he presented should not be believed. Rather, the opposite is true. White did not take the stand but presented evidence on his behalf through his 2017 video. In that confession, he admits having sexually touched C.U. yet denies having had her touch him. The jury apparently believed White's 2017 confession *and his denial* because it convicted White of the crime he admitted to in that 2017 video (Count I), but acquitted him of the crime he steadfastly denied (Count II).

Lastly, without White's 2014 video confession, the jury would still have had White's stipulation that he pleaded guilty in 2014 to aggravated indecent liberties with a child. That stipulation is enough to show his propensity to engage in sexual acts with a child. And the jury would have heard Gerdsen's testimony that White's 2014 crime was committed against his 15-year-old granddaughter. So even had the court excluded White's 2014 video confession, the jury would still have likely convicted White as they

34

did based on his stipulation, Gerdsen's testimony, and White's admission in his 2017 video to the only crime the jury found him guilty of. To have found White not guilty of either crime, the jury would have had to disbelieve White's uncontradicted admission, as well as the victim's testimony.

For those reasons, we are confident that the jury carefully based its verdict on the evidence, rather than on passion, graphic details, and other powerful potentials for prejudice in White's 2014 video confession. The State has thus met its burden to prove there is no reasonable probability that the error contributed to the outcome of the trial.

IV. DID THE CUMULATIVE EFFECT OF TRIAL ERRORS VIOLATE WHITE'S RIGHT TO A FAIR TRIAL?

White next asserts that cumulative error denied him a fair trial.

But when the defendant fails to show "two or more trial errors not individually reversible, the cumulative error doctrine is inapplicable." *State v. Hilt*, 299 Kan. 176, 200, 322 P.3d 367 (2014). That is the case here. Even if we assume that the district court erred in admitting White's 2014 video confession, we find only one error and we have rejected White's other claims of error. We thus find no cumulative error and affirm White's conviction.

V. DID THE DISTRICT COURT ERR IN SENTENCING WHITE?

Lastly, White asserts that the district court erred in sentencing him. Following the statutory requirements, the district court ordered White to serve lifetime imprisonment without the possibility of parole for 25 years with lifetime parole upon release from confinement. But the district court also imposed the parole condition of electronic monitoring. And the court's journal entry of sentencing says White is subject to lifetime

35

postrelease supervision instead of parole. White argues the district court lacked authority to impose lifetime postrelease supervision and lifetime electronic monitoring.

The State does not address White's claim regarding electronic monitoring but agrees that the district court should correct its journal entry of sentencing to reflect lifetime parole instead of lifetime postrelease supervision.

Generally, when the district court announces a criminal sentence from the bench, the district court lacks jurisdiction to later modify the sentence. *State v. McKnight*, 292 Kan. 776, 779, 257 P.3d 339 (2011) (citing *State v. McCoin*, 278 Kan. 465, 468, 101 P.3d 1204 [2004]). But under K.S.A. 2020 Supp. 22-3504(a), courts have jurisdiction to correct an illegal sentence at any time. We review an illegal sentence under K.S.A. 2020 Supp. 22-3504(a) de novo. *State v. Harsh*, 293 Kan. 585, 588, 265 P.3d 1161 (2011).

A sentencing court cannot order lifetime postrelease supervision when, as here, a defendant has been convicted of an off-grid crime. *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 (2011). So the district court here lacked the authority to impose lifetime postrelease supervision. A sentence is effective upon pronouncement from the bench, not upon the filing of a journal entry. *State v. Mason*, 294 Kan. 675, 677, 279 P.3d 707 (2012). The district court correctly pronounced the sentence but incorrectly entered the journal entry requiring lifetime postrelease supervision. We thus remand for the district court to correct the sentencing journal entry through a *nunc pro tunc* order. See K.S.A. 2020 Supp. 22-3504(b); *State v. Waggoner*, 297 Kan. 94, 99-100, 298 P.3d 333 (2013).

Similarly, a district court lacks authority to impose parole conditions. See *Waggoner*, 297 Kan. at 100. Under K.S.A. 2020 Supp. 22-3717(u), when the Prisoner Review Board orders the parole of an inmate sentenced for an offense under Jessica's Law, the Prisoner Review Board, not the court, must order lifetime electronic monitoring as a condition of parole. Because the court pronounced the lifetime electronic monitoring

requirement from the bench, we vacate this portion of White's sentence. See *Waggoner*, 297 Kan. at 100.

Conviction affirmed, sentence vacated in part, and case remanded with directions.